## A00A1603. RANDOLPH v. THE STATE.
### (538 SE2d 139)

BARNES, Judge.

A jury convicted Glenn Anthony Randolph of aggravated assault, false imprisonment, possession of a gun while committing a crime, and three counts of armed robbery. The trial court sentenced Ran-

---

[3] *Cohen v. Feldman*, 219 Ga. App. 90 (464 SE2d 237) (1995).
[4] *Munoz v. American Lawyer Media*, 236 Ga. App. 462, 466 (3) (a) (512 SE2d 347) (1999).

dolph to serve a total of 30 years, followed by 30 years on probation. He enumerates five errors on appeal, arguing that the trial court erred (1) in failing to merge two of the armed robbery convictions for sentencing purposes; (2) in refusing to charge the jury on impeachment by an inconsistent statement; (3) in denying his motion to suppress the fruits of an illegal search and seizure; (4) in admitting a victim's identification testimony; and (5) in allowing the state to comment improperly on Randolph's failure to testify. For the reasons that follow, we affirm in part, vacate in part, and remand for resentencing.

We view the evidence on appeal in the light most favorable to the verdict and no longer presume the defendant is innocent. We do not weigh the evidence or decide the witnesses' credibility, but only determine if the evidence is sufficient to sustain the convictions. *Taylor v. State*, 226 Ga. App. 254, 255 (485 SE2d 830) (1997).

The evidence at trial established that two men wearing masks robbed an Auto Zone store at gunpoint. One of the men forced the manager to open the store safe and place approximately $1,400 in bills and rolled coins into a plastic bag. Meanwhile, the other robber pistol-whipped a customer, forced employees and customers to drop to the floor, and then made them get up and go into the back of the store, where the first man robbed the manager and a customer of their wallets. The robbers left through the front door, and after a short period of time, two of the Auto Zone employees went out the back door and circled around the building toward the front.

One of the employees saw the robbers leaving with a third man in a brown, four-door Buick. That employee, who testified that he had watched one of the robbers closely the entire time he was in the store, saw the robber pull off his mask as the car drove off. "I looked dead in his face and he looked at me," he testified. He was 100 percent sure that Randolph was the robber he later identified in a photographic lineup, adding "I'll never forget [those] eyes in my life."

A short time later that afternoon, Marietta Police Officer Thomas stopped a green Ford Escort for speeding. The officer testified that he followed the car for about a mile at 65 mph in a 35-mph zone. Once the officer turned his lights on, the Escort driver slowed to 30 or 35 mph. The officer saw a lot of movement among the four people inside, which in his experience indicated that the occupants were trying to conceal something. The car finally stopped, and the driver, who was Randolph, handed the officer his license. Randolph stepped out of the car and consented to Officer Thomas's request to search it. The officer called for backup because he could not search the car with the other three occupants inside and patted down Randolph to check for weapons. The officer felt two rolls of nickels in Randolph's pocket and, with Randolph's permission, removed and

examined them. The nickels were shrink-wrapped in plastic, as if they had come from a bank or a store, which Officer Thomas testified was unusual. He returned the coins to Randolph and waited for additional officers to arrive.

When the backup arrived, the other passengers, Antavius Pitts, Sherief Chapman, and Charles Cooks, got out of the car and were separated. When patting down Cooks, one of the officers felt a plastic bulge in his crotch area, and he and Officer Thomas asked Cooks what it was. Cooks insisted several times that he had nothing in his crotch area, but the officers retrieved a brown plastic garbage bag from his pants containing $1,342 cash. Cooks then explained that he had won the money gambling and had not wanted to tell the officers about it because he did not want them to steal his money. The officers seized the money in order to begin condemnation proceedings based on Cooks's statement that the currency constituted gambling proceeds. Randolph, Pitts, and Chapman denied knowing anything about the money.

Based on the large sum of money and the occupants' movements inside the car after he activated his blue lights, Officer Thomas suspected the car might contain narcotics. A canine unit arrived and a thorough search uncovered no contraband, but because of several recent armed robberies in the area, Officer Thomas took pictures of the four men. He then gave Randolph a speeding ticket and released him, along with Pitts and Cooks. Chapman was taken into custody pursuant to an unrelated arrest warrant.

A detective testified that he prepared photographic lineups that included pictures of the four men and showed them to the only Auto Zone victim who had seen any of the robbers' faces. The victim positively identified Randolph at the photo lineup in approximately four seconds, although he could not identify any of the other men.

Cooks testified for the State after pleading guilty to robbery, false imprisonment, and aggravated assault, for which he was sentenced to serve ten years in confinement and ten years on probation. On the morning of the Auto Zone robbery, he testified, Randolph and two other men picked him up in a stolen Buick. Randolph and another man had guns with them. The four men bought and smoked some marijuana, then Randolph said that he, Pitts, and Chapman were going "to go take care of some business," meaning they were going to get some money. The three men left and returned thirty to forty minutes later, then left again because, as Randolph said, they had not finished their job. When the three men returned the second time, Randolph told Cooks, "Let's go," and the four men left in a green Ford Escort. Cooks did not know what happened to the stolen Buick. When the police began signaling the Escort to pull over, Randolph told Cooks to grab the bag of money under his seat and put it

in his pants. Cooks admitted that he knew the money was illegal, though he did not know exactly where it came from. He explained that he hid it in his pants because he was trying to look out for his friends and he did not want anyone to go to jail. Once Randolph, Cooks, and Pitts were back on the road after the traffic stop and search, Randolph told Cooks the money had come from the Auto Zone robbery.

1. Randolph argues that his convictions for two of the armed robbery counts should merge and, therefore, the trial court erred in sentencing him separately for those counts. Count 1 accuses Randolph of using a handgun on September 15, 1997, to take from Glenn Jeffries $1,352 belonging to Auto Zone, and Count 5 accuses him of using a handgun on September 15, 1997, to take from Jeffries a wallet belonging to him. The State argues that, because Randolph robbed the victim of Auto Zone's money at one end of the store, then robbed him of his wallet at the other end of the store, the two incidents were sufficiently separated by time and place as to constitute two separate robberies. We disagree.

> Robbery is a crime against possession, and is not affected by concepts of ownership. Similarly, one may only rob a person, and not a corporate entity, or an object such as a cash drawer. See [OCGA § 16-8-41]. It follows that since there was only one victim, the employee, who was by this single transaction despoiled of his possession of both [his own money and his employer's money], there was only one robbery.

*Creecy v. State*, 235 Ga. 542, 544 (5) (221 SE2d 17) (1975). No evidence in the record shows that these offenses were committed sequentially. Compare *Denson v. State*, 212 Ga. App. 883, 884-885 (3) (443 SE2d 300) (1994). When one victim is robbed of more than one item in a single transaction, only one robbery may be charged. *Bland v. State*, 264 Ga. 610, 612 (4) (449 SE2d 116) (1994). Consequently, the trial court erred in entering a separate judgment of conviction and sentence for armed robbery as alleged in Count 5 of the indictment. That judgment of conviction is vacated, and the trial court is directed to strike the sentence imposed on the fifth count. *Snelling v. State*, 215 Ga. App. 263, 268 (2) (450 SE2d 299) (1994).

2. Randolph contends the trial court erred in refusing to charge the jury on impeachment by a prior inconsistent statement, namely, Cooks's first response to the police at the traffic stop, in which he denied having anything down his pants. The evidence showed that Cooks actually did have a plastic bag full of money in his crotch.

The first half of Randolph's requested jury charge read as follows:

> To impeach a witness is to prove the witness is unworthy of belief. A witness may be impeached by: a. Disproving the facts to which the witness testified; b. Proof of general bad character; c. Proof that the witness has been convicted of a crime involving moral turpitude; d. Proof of contradictory statements, previously made by the witness, as to matters relevant to the witness's testimony and to the case. If it is sought to impeach a witness by "b," "c," or "d," above, proof of the general good character of the witness may be shown. The effect of the evidence is to be determined by the jury.

The second half of Randolph's impeachment charge dealt with attempting to impeach a witness by proof of contradictory statements previously made. The trial court declined to give the charge because it believed that the contradictory statement had to be an "official statement made and not just something you mouth off at the scene."

While the trial court was incorrect in concluding that a contradictory statement must be "official" before a witness can be impeached (see *Shropshire v. State*, 226 Ga. App. 669, 671 (487 SE2d 384) (1997)), we find no error in its refusal to give Randolph's impeachment charge. The requested charge included all of the methods of impeaching a witness and thus was not specifically tailored to the evidence. "A request to charge the jury must be legal, apt, and precisely adjusted to some principle involved in the case, and be authorized by the evidence." (Citation and punctuation omitted.) *Seawright v. State*, 172 Ga. App. 517, 518 (6) (323 SE2d 704) (1984). Moreover, the court charged the jury on witness credibility and impeachment generally.

3. Randolph asserts the trial court erred in denying his motion to suppress testimony regarding the rolls of nickels found in his pocket and the photograph taken of him during the traffic stop.

(a) First, regarding the nickels in his pocket, Randolph argues that "no consent [to search] can be deemed voluntary where a police officer is exerting physical force in the intimate regions of a person's pants pockets and is at the same time asking for consent." He cites no authority for this proposition, nor does he cite to any testimony showing the officer was "exerting physical force."

The police officer who stopped Randolph for speeding testified both at the hearing on his motion to suppress and at trial that after asking Randolph to step out of the car, Randolph agreed to allow him to search the car. While waiting for backup to arrive, the officer patted down Randolph for weapons and asked him about a bulge in his

front pocket. Randolph told him the bulge was rolls of coins and said he did not object to the officer removing and observing them.

> Where the state seeks to justify a warrantless search on grounds of consent, it "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U. S. 543, 548 (88 SC 1788, 20 LE2d 797) (1968). A valid consent eliminates the need for either probable cause or a search warrant.

(Citation omitted.) *Dean v. State*, 250 Ga. 77, 79-80 (2) (a) (295 SE2d 306) (1982). We must accept the trial court's ruling at a suppression hearing as to the credibility of an officer's testimony regarding a defendant's consent to a search, unless that ruling is clearly erroneous. Id. "Insofar as the trial court's ruling reflects a resolution of this question of credibility in favor of the State, we find no error[,] as such is supported by the evidence." *Bobbitt v. State*, 195 Ga. App. 566, 567 (394 SE2d 385) (1990).

(b) Randolph contends that being detained for 45 to 90 minutes after being legally stopped for speeding constituted an illegal seizure. Therefore, Randolph's photograph taken at the end of that detention, as the fruit of that illegal seizure, should have been suppressed. If the photograph had been suppressed, the witness's identification stemming from the photo lineup would also have been suppressed.

The United States Supreme Court has adopted a dual inquiry for evaluating the reasonableness of a lengthy investigative stop. *United States v. Sharpe*, 470 U. S. 675, 682 (105 SC 1568, 84 LE2d 605) (1985). First, we consider whether the officer's action was justified at its inception, and second, whether it was "reasonably related in scope to the circumstances which justified the interference in the first place." Id., citing *Terry v. Ohio*, 392 U. S. 1, 20 (88 SC 1868, 20 LE2d 889) (1968).

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*Sharpe*, supra, 470 U. S. at 686.

> [W]e note that [the officer's] stop of appellant was based on *probable cause,* as he observed appellant committing a traffic violation and initially stopped and detained him for this

reason. The fact that this was a probable cause stop is a *significant factor* that weighs heavily in the police's favor.

(Emphasis in original.) *Mallarino v. State*, 190 Ga. App. 398, 402 (2) (379 SE2d 210) (1989). We concluded in *Mallarino* that a detention of 33 minutes from the initial stop to the time the defendant signed a consent to search and of an additional hour and a half to the time he was remanded to local police authorities was not unreasonable. Id.

Here, Officer Thomas initially stopped Randolph because he was driving 65 mph in a 35-mph zone. Randolph took a long time to pull over, and the officer saw "a lot" of shoulder movement among the four occupants of the car, which made him suspect that they were trying to conceal something. The occupants gave conflicting reports about where they had been and where they were going. After receiving Randolph's consent to search the car five minutes after the stop, the officer called for backup to secure the three passengers while he searched. After the backup officers arrived five to ten minutes later, one of them discovered a plastic bulge in Cooks's crotch during a weapons pat-down. Cooks eventually told them he made the money gambling, an illegal activity, and the police confiscated the funds. Believing illegal narcotics might be present in the car, which had not yet been searched, Officer Thomas requested a canine unit, which arrived ten to fifteen minutes later. Although the dog indicated that it smelled contraband, the officers found no illegal substances.[1] After talking to other detectives about recent armed robberies in the area, Officer Thomas photographed the four men for possible identification by the robbery victims. He then issued a speeding ticket to Randolph, and the men left the scene.

Under these circumstances, we conclude that the length of the investigatory stop was not unreasonable. The trial court did not err in denying Randolph's motion to suppress his photograph, which led to his subsequent identification by one of the robbery victims. *Roundtree v. State*, 213 Ga. App. 793, 794 (446 SE2d 204) (1994); *Mallarino*, supra, 190 Ga. App. at 402.

4. Randolph contends that his identification by the State's sole eyewitness was tainted by an impermissibly suggestive photo lineup. He asserts that his picture, in the center of the six-photo lineup, was the only one that matched the victim's description of a light-skinned "similar to Hispanic" male with long hair.

The test employed in such cases "is whether the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *McCoy v.*

---

[1] The trial court did not allow the State to present evidence to the jury that the dog indicated the possibility of drugs, because no drugs were found.

*State*, 190 Ga. App. 258, 260 (3) (378 SE2d 888) (1989). Further, when evaluating the likelihood of misidentification, courts must consider: (a) the opportunity of the witness to view the criminal at the time of the crime, (b) the witness's degree of attention, (c) the accuracy of the witness's prior description of the criminal, (d) the level of certainty demonstrated by the witness at the confrontation, and (e) the length of time between the crime and the identification. Id. at 260-261.

In this appeal, the victim testified that he had his eye on Randolph the whole time he was in the store; while the robber wore a mask, the victim watched the robber "dead in his eyes the whole time." Immediately after the robbers left the store through the front door, the victim ran out the back and around the building, where he saw Randolph inside his getaway car taking off his mask. He was 100 percent sure of his identification, testifying that he would never in his lifetime forget Randolph's eyes. He positively identified Randolph from the photo lineup in "approximately four seconds."

Considering these factors, we conclude that under the circumstances of this case, we find no substantial likelihood of irreparable misidentification. The trial court did not err in denying Randolph's motion to suppress the victim's identification of Randolph as one of the robbers.

5. Finally, Randolph argues that the trial court erred in overruling his objection to a portion of the State's closing argument, as follows:

> [THE STATE]: The rolled nickels in Mr. Randolph's pocket: haven't heard any explanation for those. And remember the police officer says: Yeah, that was weird.
> [DEFENSE COUNSEL]: Let me interpose an objection to that last comment.
> [THE STATE]: Your Honor, I can argue evidence that's been un-rebutted.
> THE COURT: Well, the jury will remember the evidence.

Randolph's claim of error on appeal, that the State improperly commented on his constitutional right to remain silent, is beyond the scope of the objection made at trial, for which no ground was given. Therefore this issue was not preserved on appeal. *Reddin v. State*, 223 Ga. App. 148, 153 (6) (476 SE2d 882) (1996).

*Judgment affirmed in part and vacated in part with direction. Blackburn, P. J., and Eldridge, J., concur.*

DECIDED AUGUST 8, 2000 —
RECONSIDERATION DENIED SEPTEMBER 27, 2000 — 

*Ruth P. Marks*, for appellant.

*Patrick H. Head, District Attorney, Ann B. Harris, Dana J. Norman, Assistant District Attorneys*, for appellee.