A02A1107. KING v. THE STATE.
(575 SE2d 679)

POPE, Senior Appellate Judge.

Larry King was tried and convicted of armed robbery and burglary. He appeals, arguing that the trial court erred in denying his motion to suppress, in denying his objection to the admission of a videotape into evidence, and in sentencing him as a recidivist. For the following reasons, we reject King's arguments and affirm.

Viewing the evidence in the light most favorable to the verdict, it showed that Mercer Brown and his wife were in their room at Ashton Hall, a personal care home, on the evening of October 24, 1999, watching a ball game on television. Mrs. Brown suffered from Alzheimer's disease. A man burst into the room, pointed a gun at Mr. Brown and demanded money from him. Mr. Brown complied by giving the robber several dollars. The robber then demanded more money and pointed the gun at Mrs. Brown's head. Mr. Brown then gave the man more money. Mr. Brown described the robber as a black man, wearing a knit cap and a leather jacket. He described the gun as a small revolver, possibly a toy.

James Curtis McGill, owner of the nursing home, was called to the scene of the crime and noticed that the perpetrator had entered through a window in a vacant room. McGill observed that the screen had been pried back, the window had been opened and there were two sets of muddy footprints on the floor. One set of prints led to

---

[3] *Gearin v. State of Ga.*, 218 Ga. App. 390, 392 (461 SE2d 562) (1995); *Salmon v. State of Ga.*, 249 Ga. App. 591 (1) (549 SE2d 421) (2001).

another room; the other led to the room occupied by Mr. and Mrs. Brown. McGill surmised that the break-in was an inside job because the assailants had gone straight to the Browns' room and bypassed several other potential victims. When McGill talked to Mr. Brown about the robber, he learned that the robber wore a leather jacket that matched a jacket owned by an employee who had just been terminated, named David Santiago.

Officers from the Lawrenceville Police Department arrived on the scene and talked with McGill, Brown and other employees at Ashton Hall. McGill told the officers that Santiago had worked at Ashton Hall, but had been fired two weeks earlier for drug use. McGill told the officers that Santiago drove a white Cutlass with gold wheels and that he frequented the Memorial Apartments in Lawrenceville. Based on this information, Officer Eberhardt issued a be on the lookout (BOLO) for a white Oldsmobile Cutlass with gold wheels, occupied by a black male wearing a black leather jacket and a stocking cap.

Within a few minutes Officer Randy Dobbins responded to the BOLO, stating that he had spotted an Oldsmobile fitting the description behind the Memorial Apartments. Dobbins saw a man, later identified as David Santiago, standing outside the car. Dobbins drew his weapon and asked Santiago to show his hands. He then asked Santiago if there were any occupants in the vehicle, and Santiago responded that there was a passenger. Dobbins then had the passenger, later identified as King, step out of the vehicle. The men were then placed in handcuffs in separate patrol cars.

Santiago consented to a search of his car. The officers searched the car and found four bullets in a film canister, a black leather jacket and a dark blue stocking cap. Meanwhile, at the crime scene, a specially trained dog tracked the perpetrators' scent; the officers determined that the perpetrators had left the nursing home from a parking area. Officers Eberhardt and Russell saw the muddy footprints at the entry and learned from other officers that both of the defendants had muddy shoes. Officer Eberhardt then went to the apartments and compared King's and Santiago's shoes to the shoe prints found at the scene. He then determined that there was probable cause to arrest the men. Eberhardt arrested the men, read them their *Miranda* rights and took their shoes to hold for evidence.

Before the men were arrested, Mr. Brown arrived at the apartments for a showup. Mr. Brown was uncertain of whether he recognized King; he explained that his eyesight was not good and he could not be positive of any identification. The night of the robbery Brown told the police that the robber was a black male, about five feet ten inches to six feet tall, that he weighed about 160 pounds and that he was wearing a black leather jacket and a black stocking cap. Brown

testified at trial that he knew Santiago and recognized him when he arrived at the apartments for the showup on the night of the robbery; in fact, he lent $5 to Santiago the night before the robbery and stated that Santiago saw that Brown had more money in his wallet.

After they were arrested, and the *Miranda* rights were read to them, King and Santiago sat in the back of the patrol car. Unbeknownst to them, their conversation was recorded on a hidden microphone. During this conversation, the men discussed whether one of them was recognized; the other voice replied "he ain't had enough time to see us, did he, when we ran?" King and Santiago continued their conversation until the officer got in the car and drove them to the police department at which point the tape ended.

At trial a member of the Gwinnett County Crime Scene Unit testified that she made plaster casts of both sets of footprints at the scene of the crime. There was testimony that those plaster casts were consistent with footprints from the shoes which were taken from King and Santiago.

1. In his first enumeration of error, King argues that the trial court erred in not granting his motion to suppress the tape recording and his shoes because both were the result of an illegal detention. Specifically, King contends that there was no articulable suspicion on which to question Santiago, much less to detain and question King.

These arguments lack merit. When Officer Dobbins first questioned King and Santiago, the robbery had occurred less than an hour earlier and the BOLO had been issued just minutes before. Officer Dobbins stated that the white Oldsmobile with gold wheels matched the description in the BOLO; further the described car was in the vicinity which Santiago was known to frequent and both King and Santiago fit the general description of the suspect. With respect to a detention like this one:

> The United States Supreme Court has adopted a dual inquiry for evaluating the reasonableness of a lengthy investigative stop. First, we consider whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place. In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

(Citations and punctuation omitted.) *Randolph v. State*, 246 Ga. App. 141, 146 (3) (b) (538 SE2d 139) (2000).

Officer Dobbins had an objective, reasonable suspicion of criminal wrongdoing to justify his initial stop of both King and Santiago. See, e.g., *Givens v. State*, 218 Ga. App. 415, 417 (1) (461 SE2d 579) (1995); *In the Interest of B. K. M.*, 247 Ga. App. 588 (544 SE2d 504) (2001). Similarly, Dobbins' continued investigation of the men was reasonable: he handcuffed them for safety purposes, see *Jackson v. State*, 236 Ga. App. 492, 495 (2) (512 SE2d 24) (1999), and briefly detained them in the patrol car for further questioning. These actions, too, were reasonably related to the objective suspicion that King and Santiago were involved in the robbery. "In determining whether an officer's conduct during an investigatory stop was proper, the inquiry is not whether the officer could validly have acted similarly but whether under the same circumstances a reasonable officer would have done so." (Citations and punctuation omitted.) Id.

After Dobbins' initial questioning of the men, Santiago consented to a search of the car. During this search, the officers found the black leather jacket and blue stocking cap like the garments described in the BOLO. Additionally, they found bullets in a film canister. A few minutes later, Officer Eberhardt arrived on the scene and examined King's and Santiago's shoes, comparing them to the muddy footprints at the scene. Then, Eberhardt correctly concluded that he had probable cause to arrest the men and they were read their rights. There was testimony that the men were detained less than 30 minutes before this arrest took place.

When reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's findings of fact unless they are clearly erroneous. *Sanders v. State*, 247 Ga. App. 170 (543 SE2d 452) (2000). Using this standard of review here, we find no error in the trial court's denial of King's motion.

2. Secondly, King contends that the trial court erred in allowing the video recording into evidence because no proper foundation was laid for its admission. Specifically, he claims that the State failed to prove, as required under *Johnson v. State*, 271 Ga. 375, 378 (4) (519 SE2d 221) (1999), that the audio portion of the tape was authentic and correct because, King contends, the officer in whose patrol car the recording was made was not a party to the conversation. Contrary to King's arguments, we find that the trial court did not err in allowing the tape into evidence. Officer Dobbins testified to all of the necessary elements to the foundation of the tape as set forth in *Johnson*, and the trial court properly admitted it. See generally *Fields v. State*, 223 Ga. App. 569, 571 (3) (479 SE2d 393) (1996).

3. Finally, King claims that the court erred in sentencing him as a recidivist to life without parole under OCGA § 17-10-7 (b) (2) because there was not sufficient evidence to show that he had been convicted of a previous serious violent felony in Florida, as that term

is defined in Georgia. The record contains evidence that King pled guilty to armed robbery under Fla. Stat. Ann. § 812.13 (2) (a). That statute specifically provides that the offense, which is a "felony of the first degree" is committed while robbing using "force, violence, assault," or intimidation and carrying a firearm or other deadly weapon. Nevertheless, King cites a handwritten note on the judgment and sentence from that conviction which stated: "defendant's [(King's)] accomplice was only one with firearm, therefore 3 yr. minimum not applicable." Thus, King argues, the crime was not the equivalent to a serious violent felony under OCGA § 17-10-6.1 (a).

This argument lacks merit. The note regarding King's conviction related only to his sentencing under the provisions of Fla. Stat. Ann. § 775.087 (2), which provides stricter penalties for perpetrators who actually carry the weapons. The provisions of this statute do not alter the fact that King was convicted of armed robbery. Under the same circumstances, King would also have been convicted of armed robbery in Georgia, despite the fact that he did not have actual possession of the firearm. *Howze v. State*, 201 Ga. App. 96 (410 SE2d 323) (1991).

*Judgment affirmed. Ruffin, P. J., and Barnes, J., concur.*

DECIDED NOVEMBER 25, 2002 —
RECONSIDERATION DENIED DECEMBER 16, 2002

*Michael M. Sheffield*, for appellant.
*Daniel J. Porter, District Attorney, Niria D. Baggett, Assistant District Attorney*, for appellee.