A06A0171. HICKMAN v. THE STATE.
(631 SE2d 778)

MIKELL, Judge.

David J. Hickman was convicted of trafficking in 400 or more grams of cocaine and sentenced to 30 years, 25 to serve and the remainder on probation. Hickman's sole enumeration of error is that the trial court erred when it denied his motion to suppress. We affirm.

> When an appellate court reviews a trial court's order concerning a motion to suppress evidence, the appellate court should be guided by three principles with regard to the interpretation of the trial court's judgment of the facts. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.[1]

The uncontroverted evidence presented at the suppression hearing shows that Investigator Anthony Lockard of the Gwinnett County Drug Task Force conducted a drug investigation on June 30, 1998,

---

[1] (Citation and punctuation omitted.) *Castillo v. State*, 232 Ga. App. 354, 355-356 (502 SE2d 261) (1998). See also *Dole v. State*, 256 Ga. App. 146-147 (1) (567 SE2d 756) (2002).

wherein he used a confidential informant ("CI") to arrange a cocaine purchase. That evening, the CI called Kenneth Nelson[2] and arranged to purchase a quarter of a kilo of cocaine for $6,200. The transaction was to take place at the Cub Foods parking lot on Jimmy Carter Boulevard in Norcross at 10:00 p.m. The CI told Lockard that Nelson would be driving a relatively new, green, step-side pickup truck. Lockard and other members of the task force set up surveillance in the Cub Foods parking lot so that each entrance and exit to the shopping complex could be observed by an officer. Since the officers did not have the money to complete the drug transaction, the plan was to follow Nelson's car and then pull him over. Lockard explained that when conducting a "buy bust," the officers look for the number of occupants in the vehicle and whether there is another vehicle doing countersurveillance and that other parties sometimes appear because they have a financial interest in the drugs.

After Nelson failed to show at 10:00 p.m., Lockard instructed the CI to call Nelson at 10:15 p.m. Lockard listened to the conversation and heard Nelson tell the CI that he was at a nearby gas station and would be arriving soon. Nelson arrived at approximately 10:30 p.m. and the CI pointed out Nelson's vehicle. The officers immediately noticed that Nelson's vehicle was being trailed by a brown Mercedes Benz, which they later determined was driven by Hickman. Lockard testified that the cars were so close that another car could not have fit between them; that they turned in at the exact same time; that the traffic was extremely light because a thunderstorm had just passed through the area and knocked out most of the lighting in the area; and that there were several other stores in the shopping complex but most of the businesses appeared to be closed. Lockard recalled that both vehicles traveled the length of the shopping center, passing several stores and driveways, and stopped at a stop sign at Live Oak Parkway; that at the stop sign, the vehicles had the option of turning left or right; that at the next intersection, the vehicles could have traveled in three different directions but both turned right; and that the vehicles continued to travel at the same speed and distance from each other until they both turned into a gas station.

Based on the driving patterns of the vehicles, Lockard determined that they were traveling together and that Hickman was involved in the transaction to keep an eye on Nelson. Lockard testified that the officers followed the vehicles to the gas station and a canine police officer pulled in behind the suspects' vehicles; that they approached the vehicles and removed the occupant; that Nelson

---

[2] Nelson and Hickman were jointly indicted.

consented to a search of his truck; and that the officers found a half a kilo of cocaine in the truck.

Sergeant J. K. Taylor testified that he was present at the scene to help supervise the drug deal and was involved in the planning; that he determined that the Mercedes was following the pickup truck based on the fact that both cars made a series of turns and that he made the decision to block in the Mercedes when they stopped the pickup truck; that the members of the undercover team also discerned that the car was following the truck; that in his experience, when large amounts of drugs and money are being exchanged, the supplier sometimes appears on the scene to monitor the transaction or sends someone else to do so and that the activities that he observed were consistent with this pattern; and that he had been involved in hundreds of drug deals and that frequently, more people show up than are expected.

Officer Robert E. Kenyon testified that ten or fifteen minutes after the officers removed the occupants from the cars at the gas station, he was asked to walk his drug dog around the Mercedes. The dog did a free air search around the vehicle and alerted to the odor of narcotics, at which point Kenyon opened the driver's door. The dog sniffed the interior of the car and alerted on the center console. Kenyon opened the center console, which contained marijuana, and told Lockard that there were narcotics in the car.

Lockard proceeded to search Hickman's vehicle, finding a small quantity of cocaine and a marijuana joint laced with cocaine in the center console. In the back seat of the car, he found $8,000 in cash and a ledger containing names, dollar amounts, and other calculations. Lockard testified that at the time that he searched Hickman's vehicle, Hickman had not yet been placed under arrest but had been detained while the officers investigated and that he would not have searched the vehicle without Hickman's consent if the drug dog had not alerted on it. Hickman moved to suppress the items found in his car on the grounds that the stop and the subsequent detention were unlawful. The trial court denied the motion. On appeal, Hickman challenges the denial of his motion, asserting the unconstitutionality of the stop and the detention. Because there is evidence to support the trial court's findings that the stop and detention were lawful, we agree with the trial court's ruling.

There are at least three tiers of police-citizen encounters: (1) verbal communications, which involve no coercion or detention; (2) brief "stops" or "seizures" that require reasonable suspicion; and (3) "arrests," which must be supported by probable cause.[3] A second-tier

---

[3] *State v. Causey*, 246 Ga. App. 829, 831 (1) (540 SE2d 696) (2000); *State v. Folk*, 238 Ga.

stop "must be justified by 'specific and articulable facts' which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[4] In *United States v. Cortez*,[5] the Supreme Court discussed, at length, the elusive nature of what is deemed sufficient to authorize the police to stop and detain a citizen.[6] The court stated that

> the essence of all that has been written about the definition of articulable reasons and founded suspicions is that the totality of the circumstances — the whole picture — must be taken into account. This totality of the circumstances test consists of two elements: (1) The determination must be based upon all the circumstances gathered from objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. The trained police officer makes a determination from these data — this determination can be based upon inferences and deductions that might well elude an untrained person. In reaching such deductions, police officers are authorized to make common sense conclusions about human behavior. Additionally, the evidence must be viewed from the perspective of what action a reasonable police officer would take. (2) The second element which must be present before a stop is permissible requires that during the process of analyzing the facts as described in the first element, a suspicion must arise that the particular individual being stopped is engaged in wrongdoing.[7]

Based on the evidence in the record, specifically the officers' testimony regarding their observations, experience with drug sales, and the general modes of operation of persons involved in drug sales, we find that the officers were authorized to stop Hickman's vehicle.

The officers were also authorized to use the drug dog to search the vehicle. "[T]he use of a drug sniffing dog to conduct a free air search around the exterior of a vehicle during the course of a lawful traffic stop does not implicate the Fourth Amendment under the

---

App. 206, 207 (521 SE2d 194) (1999).

[4] (Citations and punctuation omitted.) *Painter v. State*, 227 Ga. App. 875, 877 (490 SE2d 544) (1997).

[5] 449 U. S. 411 (101 SC 690, 66 LE2d 621) (1981).

[6] *Causey*, supra at 832 (1) (b).

[7] (Citations, punctuation and footnotes omitted.) Id. at 832-833 (1) (b), citing *Cortez*, supra at 417-418 (II) (A). See also *Cheatham v. State*, 204 Ga. App. 483, 484 (1) (419 SE2d 920) (1992).

United States Constitution."[8] Once the drug dog alerts, probable cause to search the vehicle is established.[9]

Next, we address Hickman's argument that his detention was unreasonable, amounting to an unconstitutional seizure. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."[10] In the instant case, the officers arranged to have the canine unit at the scene when the stop occurred. Officer Kenyon testified that he saw the officers remove the occupants from all of the cars and that within ten to fifteen minutes, he was asked to walk his dog around Hickman's car. The dog immediately conducted a free air search around the car. Once the dog alerted, Kenyon allowed the dog to enter the car, and the narcotics were found in the center console. In *Roundtree v. State*,[11] we held that the length of an investigatory stop was reasonable where "[a]pproximately 19 minutes passed from the time the arresting officer initiated the traffic stop until the officer requested the drug dog [and] [t]he drug dog was brought to the scene within 15 minutes of that request."[12] Therefore, in the case sub judice, where Hickman was detained for, at most, 15 minutes, the detention was not unreasonable and did not amount to an impermissible seizure. Accordingly, Hickman's argument on this point fails as well.

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED MAY 25, 2006.

*Thomas M. West*, for appellant.
*Daniel J. Porter, District Attorney, Dan W. Mayfield, Assistant District Attorney*, for appellee.

---

[8] (Citation omitted.) *Bowens v. State*, 276 Ga. App. 520 (623 SE2d 677) (2005). In fact, even without reasonable and articulable suspicion, an officer may use a canine trained in drug detection to sniff a vehicle's exterior. Id. at 522.

[9] *Donner v. State*, 191 Ga. App. 58, 60 (380 SE2d 732) (1989). Accord *Williams v. State*, 273 Ga. App. 637, 639 (1) (615 SE2d 789) (2005).

[10] (Punctuation and footnote omitted.) *Garlington v. State*, 268 Ga. App. 264, 270-271 (3) (601 SE2d 793) (2004).

[11] 213 Ga. App. 793 (446 SE2d 204) (1994).

[12] Id. at 794. See also *King v. State*, 258 Ga. App. 872, 875 (1) (575 SE2d 679) (2002) (30-minute detention of suspect suspected of wrongdoing was not unreasonable).