### S99G0564. GARMON v. THE STATE.
(524 SE2d 211)

Hines, Justice.

We granted certiorari to the Court of Appeals to consider its determination in *Garmon v. State*, 235 Ga. App. 671 (510 SE2d 350)

(1998), upholding the trial court's denial of Garmon's motion to suppress evidence used to convict him of trafficking in methamphetamine. Garmon asserted that police obtained the evidence following the illegal stop of his vehicle, resulting in his arrest without probable cause. Focusing on *Michigan v. Summers*, 452 U. S. 692 (101 SC 2587, 69 LE2d 340) (1981), a plurality of the Court of Appeals concluded that the stop and subsequent search were reasonable within the meaning of the Fourth and Fourteenth Amendments. We agree that the stop and search were lawful, but do so because the initial stop of Garmon's vehicle was authorized under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

The relevant facts are detailed by the Court of Appeals: In July 1995, a Douglas County inmate informed Douglas County Sheriff's Department investigator Howell that a man called "Speed," whose real name the inmate believed to be Sammy Garmon, had sold methamphetamine to another individual. Howell also learned that Garmon might be acquainted with another individual who allegedly was a methamphetamine dealer. Howell investigated the information and obtained a police photograph of Garmon relating to a prior driving under the influence arrest. In mid-August, Howell and another investigator spotted Garmon's black Chevrolet truck outside a pool hall. After entering the pool hall, they observed Garmon conduct what appeared to be a hand-to-hand drug transaction. However, the investigators did not further explore the apparent transaction, and Howell's investigation of Garmon ceased shortly thereafter.

Howell began an unrelated investigation into an illegal sports betting operation. In that regard, Howell obtained a wiretap warrant to monitor telephone calls made to the residence of Michael Wilson. During the wiretap investigation, which started on December 20, 1995, the officers overheard conversations indicating that a person named "Sammy" was participating in illegal gambling and narcotics activity. On one occasion an individual called the house asking if Wilson had any "white stuff," and Wilson responded that "he would have to wait until Sammy called him back." In three additional calls, speakers stated that Sammy had won or lost various amounts of money.

On December 29, Howell obtained a no-knock search warrant for Wilson's home to obtain evidence of crimes relating to gambling and controlled substances, specifically documents, records, notes, recordings, controlled substances, U. S. currency, and telephone billing records. In a six-page affidavit appended to the warrant, Howell detailed the mechanics of the gambling operation, which he had learned through monitoring the telephone calls to Wilson's home. Howell's affidavit named several individuals involved in the sports betting operation and set forth the volume of activity (9,000 calls in a

two-month period), as well as referencing other signs of observed gambling activity. The affidavit stated Howell's belief that controlled substances might be found as well because in various monitored conversations Wilson stated that he enjoyed consuming marijuana. Howell also stated that he believed that the evidence sought would be then located at Wilson's residence because that weekend there were to be several professional and college football games. Howell's affidavit asserted the need for a "no-knock" warrant because documents and records were easily and quickly destroyed by fire; sometimes gambling records were kept on special paper that burns easily; and items could be flushed down the toilet.

On December 30, 1995, the Douglas County Sheriff's Department set up a surveillance of Wilson's residence and observed a truck parked in the driveway. A license tag check revealed that the truck was registered to a man known to police as a person who sold methamphetamine.

The officers' plan was to execute the search warrant for Wilson's home on the evening of January 2, 1996 to coincide with one of the largest betting games of the year. That evening, around 8:15 p.m., before the search warrant was executed, Howell and other officers monitoring the wiretap on Wilson's telephone overheard a conversation between "Sammy" and "Dan," the parties having been identified from IRS information as Sammy Joe Garmon and Dan Boone. During the conversation, "Sammy" and "Dan" made a side bet. About ten minutes after hearing that conversation, Howell arrived at Wilson's residence and set up surveillance. Three to five minutes later, Howell saw an unidentified man (later identified as Garmon) and woman leave the house and get into a pickup truck.

Because they were in the "process of getting everybody together" to execute the search warrant, and were "stopping the vehicles that were leaving the house," Howell instructed another investigator, Bearden, to perform a traffic stop on the truck and detain its occupants. Bearden began following the truck, but because he was in an unmarked car, Bearden had to call another patrol car to actually make the stop. The truck was stopped approximately two miles from Wilson's home. Upon approaching the truck, Bearden noticed the driver's "eyes were very glassy, and his speech was slurred." Bearden did not smell any alcohol, but suspected that the driver was under the influence of drugs. However, the driver was not speeding or weaving and Bearden was not investigating him for driving under the influence. Bearden asked the driver for his license and insurance card, both of which identified the driver as Sammy Garmon. When Bearden notified Howell that Garmon was the driver, Howell responded that he "had information on [Garmon] that [Garmon] was a meth dealer, and [Bearden] needed to check him pretty close."

After his conversation with Howell, Bearden asked Garmon if he would consent to a search of the truck. Garmon initially said that he would, but immediately changed his answer. When Garmon refused, Bearden called a canine unit to perform a "free air search around the vehicle." While waiting for the canine unit, Bearden patted down Garmon for safety reasons. During the pat-down, Bearden discovered what appeared to be two gambling sheets in Garmon's left back pocket, $8,417 in his right front pocket, and a knife or knives.

Approximately five minutes later, the canine unit arrived and after walking around the truck, the dog signaled the possible presence of drugs near the driver's side door. After the dog's handler opened the passenger side door, the dog alerted on a tissue box located on the passenger side floorboard. Inside the box, officers found a rocky, powdery substance which they suspected was a narcotic, and which Garmon affirmed was methamphetamine.

Garmon and his female passenger were placed in the back of a patrol car. Bearden searched the woman's pocketbook and found syringes and a sock containing loose methamphetamine.

1. The admissibility of the evidence at issue begins with the legality of the initial stop and detention of Garmon. But, it is not, as the Court of Appeals plurality concluded, largely dependent upon the restricted power of police to detain the occupants of a premises while a warranted search is conducted, as authorized by the United States Supreme Court in *Michigan v. Summers,* supra. There the Supreme Court concluded that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers* at 705 (III). See also OCGA § 17-5-28; *Gober v. State,* 264 Ga. 226, 227 (2) (a) (443 SE2d 616) (1994).

2. But, the United States Supreme Court has also determined,

[b]alancing the "inestimable right of personal security" against the interest of effective law enforcement, . . . that a law enforcement officer may conduct a constitutional investigatory stop of an individual when the officer "is able to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant that intrusion."

*Postell v. State,* 264 Ga. 249 (443 SE2d 628) (1994), citing *Terry v. Ohio,* supra at 21. That is, under the totality of the circumstances, the investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. Id. at 249, citing *United States v. Cortez,* 449 U. S. 411, 417

(101 SC 690, 66 LE2d 621) (1981). Such articulable suspicion that the law has been or is about to be violated is "less than probable cause, but greater than mere caprice." *McGaughey v. State*, 222 Ga. App. 477, 479 (474 SE2d 676) (1996). What is necessary is a founded suspicion, some basis from which the court can determine that the detention was not arbitrary or harassing. *Johnson v. State*, 230 Ga. App. 535, 537 (1) (496 SE2d 785) (1998). Thus, "in cases where there are some reasonable articulable grounds for suspicion, the state's interest in the maintenance of community peace and security outweigh the momentary inconvenience and indignity of investigatory detention." *Brisbane v. State*, 233 Ga. 339, 343 (211 SE2d 294) (1974). Each case turns on its own circumstances. Id. at 342.

At the time that Howell instructed Bearden to stop Garmon there were objective manifestations which reasonably led police to conclude that the male driver of the truck was engaged in criminal activity. The driver and companion were leaving Wilson's residence, at which it had been determined there was probable cause that it was then the location of controlled substances and the site of a high volume illegal sports betting operation, in full swing because it was a big sports weekend. Thus, it was reasonable to believe that persons then at the residence might be directly or indirectly involved in criminal activity. See *Hayes v. State*, 202 Ga. App. 204 (414 SE2d 321) (1991). See also *Bales v. State*, 216 Ga. App. 856 (456 SE2d 112) (1995); *Setser v. State*, 209 Ga. App. 57 (432 SE2d 652) (1993). It was believed that the exiting truck was that of a known methamphetamine dealer. Additionally, the stop was within twenty minutes of the police monitoring the wiretap on the telephone at the residence, which was about to be searched, and their overhearing two men, "Sammy" and "Dan" discussing gambling and making a side bet. They had also overheard "Sammy" referred to in regard to a drug transaction. Through other independent information, the police believed that the men just on the telephone were Sammy Joe Garmon and Dan Boone, both suspected of criminal activity. Garmon had been mentioned with regard to supplying drugs, and had, in fact, been directly observed by police conducting what appeared to be an illegal drug transaction; both he and Boone were overheard engaging in illegal gambling activity. It was reasonable for police to believe that the man exiting the house via the truck was either Garmon or Boone, and the police had reason to stop either of them. Alternatively, it was reasonable to conclude that the man could be Wilson himself, who was believed by police to be a drug user in addition to his involvement with the illegal gambling, or indeed, the known drug dealer who was the apparent owner of the truck. Also, the nature of the betting operation itself and the trade in controlled substances made it reasonable to conclude that it was possible, if not probable,

that there would be contraband in the vehicle leaving the residence at that time. These circumstances, which included information derived from direct police observation of criminal activity, provided a basis for reasonable and articulable suspicion justifying the stop. *Burgeson v. State*, 267 Ga. 102, 105 (3) (a) (475 SE2d 580) (1996); *McGhee v. State*, 253 Ga. 278, 279 (1) (319 SE2d 836) (1984). Compare *Postell v. State*, supra.

The fact that the stop was two or three miles from the targeted residence does not affect or diminish the manifestations of criminal activity warranting the investigatory detention under *Terry v. Ohio* and its progeny. And maintaining the distance from the residence was reasonable under the circumstances because stopping the vehicle and its occupants closer in time or distance from the residence could have jeopardized the execution of the search warrant.

3. Finally, any articulated predetermined plan to stop vehicles leaving the residence is not dispositive of the legality of the initial stop and detention under a *Terry*-type rationale because such an analysis is based on objective criteria, not on the subjective or ulterior motive of police. See *Whren v. United States*, 517 U. S. 806 (116 SC 1769, 135 LE2d 89) (1996). Contrary to Garmon's assertion, the existence of the police plan, in and of itself, did not, as a matter of law, render the scope of the stop excessive so as to transform it into an arrest unsupported by probable cause. And the actual circumstances of the stop and subsequent search do not allow the conclusion of illegal arrest either. Assuming, for the sake of argument, that the investigatory detention became an arrest because of its duration, it can hardly be said that it was without probable cause. Just after the stop, the officer observed Garmon's impaired physical state and concluded that he was then under the influence of drugs, and after Garmon's identity was disclosed, the detaining officer also knew that Garmon was a suspected drug dealer. It was then not unreasonable for the officer to anticipate that Garmon, who was suspected of involvement in the drug trade as well as illegal gambling, might be armed, and to do a pat-down search. See *Stewart v. State*, 227 Ga. App. 659, 660 (2) (490 SE2d 194) (1997). The results of the pat-down and the fruits of the subsequent "free air search," see *Pitts v. State*, 221 Ga. App. 309, 311 (2) (471 SE2d 270) (1996), coupled with the officer's knowledge and direct observation of Garmon, provided probable cause to believe that Garmon was involved in criminal conduct. See *Williams v. State*, 251 Ga. 749, 792 (7) (ii) (312 SE2d 40) (1983).

We affirm the determination to uphold the denial of Garmon's motion to suppress.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 15, 1999.

*Mark J. Kadish,* for appellant.
*David McDade, District Attorney, William H. McClain, Assistant District Attorney,* for appellee.