A08A0985. ESPOSITO v. THE STATE.

(667 SE2d 425)

MIKELL, Judge.

After a bench trial based on stipulated facts, Keith Esposito was found guilty of carrying weapons (brass knuckles) in a school safety zone, a violation of OCGA § 16-11-127.1. He was sentenced as a first offender to three years probation. In his sole enumeration of error, Esposito contends that the trial court erred when it denied his motion to suppress the brass knuckles. We disagree and affirm.

> When an appellate court reviews a trial court's order concerning a motion to suppress evidence, the appellate court should be guided by three principles with regard to the interpretation of the trial court's judgment of the facts. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support [them]. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.[1]

---

[11] OCGA § 24-4-8.

[12] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[1] (Footnote omitted.) *Hickman v. State*, 279 Ga. App. 558 (631 SE2d 778) (2006). See *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

Properly viewed, the evidence adduced at the hearing on the motion to suppress shows that on August 25, 2006, Douglas Michael Clifton, a police officer employed by the Social Circle Department of Public Safety, was patrolling the Monroe High School parking lot during a football game when he observed a vehicle driving slowly through the lot passing many empty parking spaces. Clifton followed the vehicle, noticed that it had a drive-out tag that did not appear to be properly secured, and decided to initiate a traffic stop. According to Clifton, he stopped Esposito for two reasons: the slow movement through the parking lot and the improperly secured tag. Clifton testified that he advised Esposito as to the reason for the stop and then noticed a bulge in Esposito's pants pocket. Clifton conducted a pat-down search for weapons, for his own safety as well as Esposito's, and found the brass knuckles in his pocket. Finally, Clifton testified that the football game had started at 7:00 p.m., that he stopped Esposito at approximately 8:25 p.m., and that he had been asked to patrol the parking lot because the school anticipated fighting or some other illegal activity.

On cross-examination, Clifton testified that the tag was readable, was not swinging, and had not expired. But he also testified that he stopped Esposito for "a 37," which Clifton explained meant "suspicious activity." Clifton found it suspicious that while the football game was in progress, the operator of the vehicle kept driving through the parking lot and passing open parking places, without showing any intention of parking.

Esposito testified at the hearing. He claimed that he had been unaware that there was a football game until informed by a friend's mother and "just stopped by to see if it was true." According to Esposito, his friend was playing in the game. Esposito testified that he was looking for a place to park and was driving slowly because there were people around. While looking for a parking spot, he circled the lot, and none of the spots were open because they were "probably handicapped." Esposito testified that he was about to pull into one of the only open spots, which were "on the other side of the parking lot," when Clifton pulled him over. As for the license plate, Esposito testified it was crooked because the dealership had placed it on the car and he had not had time to fix it because he had recently purchased the vehicle.

On cross-examination, Esposito admitted that he had brass knuckles in his pants. He testified, however, that he had forgotten about them. As Esposito explained: "You know, it's not like I was going to bring [them] out of the house and go for fights or anything." Esposito testified that he had never used the brass knuckles but keeps them at his house "for a look." However, the court did not hear

that colloquy and volunteered, "I think his question was what are the uses of brass knuckles?" The following colloquy ensued.

[Esposito]: Oh, the uses are you use it in a fight. . . .

THE COURT: Use them in a fight?

[Esposito]: Yes, sir.

THE COURT: So a person buying brass knuckles, would they be anticipating fighting?

[Esposito]: Well, you can buy it for a fight or you can buy it just for looks or anything. . . . I bought it because I personally wanted some to have at my house just for looks. . . . I was going to hang it on the wall.

Esposito further testified that he formerly attended Loganville High School and that his companion in the car that night also went to that school. The friend whom Esposito was going to see played football for Monroe. Esposito testified that he did not know whether Loganville was playing Monroe that night. Finally, Esposito claimed that Clifton's testimony that Esposito had driven past several open parking places was not true.

At the conclusion of the testimony, the court inquired whether Esposito was aware that schools are safety zones and people may not bring weapons onto school property. Esposito replied, "Yes, sir, but, like I said, at the time I did not know I had it with me." The court noted that on the videotape, which has not been included in the record on appeal, Esposito appeared to be wearing light summer pants. Esposito replied, "Yes, sir, but brass knuckles are also not that heavy."

The trial court rendered its ruling at the hearing, denying the motion based on the totality of the circumstances. Specifically, the court found the following facts: that the officer had been asked to patrol the school parking lot due to a concern of fighting at the football game, and that after the game had been going on for an hour and a half, a car pulled into the parking lot and drove around slowly without parking, so that it did not appear that the occupants were there for the purpose of attending the game. According to the court, this activity excited the officer's attention, and the circumstances gave the officer an articulable basis to stop the car. The court, however, determined that the tag was not a valid reason to stop the car because the officer testified that after he made the stop, he made no inquiry concerning the tag.

On appeal, Esposito contends that the officer did not have reasonable grounds under the Fourth Amendment to stop the car to

investigate his suspicions.[2] The Fourth Amendment allows a police officer to stop a vehicle "to investigate the officer's reasonable suspicion 'that the person stopped is, or is about to be, engaged in criminal activity.' "[3]

> To establish the necessary reasonable suspicion to make an investigative stop, the totality of the circumstances must show that the officer had specific and articulable facts which, taken together with rational inferences from those facts, provided a particularized and objective basis for suspecting the particular person stopped of criminal activity.[4]

"[A] founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing."[5] The "totality of the circumstances" test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[6]

In the case at bar, it was reasonable for the officer to infer, based on his training, experience, and common sense, that Esposito, who arrived with a companion long after the football game began and drove around slowly through the parking lot without parking in one of many empty spaces, was "casing" the parking lot, looking to engage in criminal activity. The officer had been hired to secure the lot, specifically to guard against fighting, which was clearly a concern of the school. Under the totality of circumstances, the brief stop was neither arbitrary or harassing, but was based on a founded suspicion of criminal activity. Esposito does not challenge the validity of the subsequent pat-down search, which yielded the brass knuckles. Therefore, his conviction is affirmed.

---

[2] Traditional Fourth Amendment search and seizure principles apply to stops conducted by law enforcement officers on school property. *State v. Scott*, 279 Ga. App. 52, 55 (1) (630 SE2d 563) (2006).

[3] *Rolfe v. State*, 278 Ga. App. 605, 606 (630 SE2d 438) (2006), citing *United States v. Cortez*, 449 U. S. 411, 417 (II) (A) (101 SC 690, 66 LE2d 621) (1981); *Terry v. Ohio*, 392 U. S. 1, 30 (V) (88 SC 1868, 20 LE2d 889) (1968); *Vansant v. State*, 264 Ga. 319, 320 (2) (443 SE2d 474) (1994).

[4] (Punctuation omitted.) *Rolfe*, supra, citing *Vansant*, supra. See also *State v. Tollefson*, 259 Ga. App. 320, 322 (1) (b) (577 SE2d 21) (2003).

[5] (Citation and punctuation omitted.) *Buffington v. State*, 228 Ga. App. 810, 811 (492 SE2d 762) (1997).

[6] (Punctuation omitted.) *Howard v. State*, 265 Ga. App. 835, 836-837 (595 SE2d 660) (2004), citing *United States v. Arvizu*, 534 U. S. 266, 273 (122 SC 744, 151 LE2d 740) (2002).

Cases cited by Esposito do not warrant a different outcome. In *Hughes v. State*,[7] our Supreme Court held that a white male driving slowly around a high crime African-American neighborhood late at night, was, standing alone, insufficient to provide a reasonable basis of criminal activity so as to support a traffic stop.[8] Following *Hughes*, we held in *Attaway v. State*,[9] that driving around a subdivision several times late at night, was, alone, insufficient to support a traffic stop on the basis of suspicious activity.[10] In both cases, a single indicator of suspicious activity was deemed insufficient to support the stop. In this case, we have more than the single indicator of simply driving around an area. Here, Esposito was "casing" the parking lot during a football game. He and his friend apparently had no intention of stopping to watch the game, as they passed many open parking places. Fighting and other illegal activity were concerns that the officer had been hired and trained to avert. Esposito's activity reasonably raised his suspicion sufficiently to warrant a brief investigatory stop.[11]

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED SEPTEMBER 17, 2008 — ▮▮▮▮▮▮▮

*Donna L. Clement*, for appellant.

*W. Kendall Wynne, Jr., District Attorney, Walter C. Howard, Assistant District Attorney*, for appellee.

---

[7] 269 Ga. 258 (497 SE2d 790) (1998).

[8] Id. at 261 (1).

[9] 236 Ga. App. 307 (511 SE2d 635) (1999).

[10] Id. at 309.

[11] See *Rolfe*, supra at 607 (stop of vehicle that left store parking lot at night when store was closed held valid to investigate suspicion that occupants may have been involved in a robbery; "oddly circuitous route" taken by vehicle appeared intended to evade officer).