A10A1335, A10A1368. PRADO et al. v. THE STATE (two cases).
(701 SE2d 871)

MIKELL, Judge.

We granted Raul Prado and Blanca Cruz-Prado's ("the Prados") application for interlocutory review of the trial court's order denying their motions to suppress. As there is evidence to support the trial court's findings of fact and the court did not commit an error of law, we affirm. Due to the complexity of the facts, we begin with a brief synopsis of the evidence adduced at the suppression hearing.

Interstate police cooperation led Gwinnett County police to conduct surveillance of 2851 Creekwood Drive in Snellville, a sus-

---

pected marijuana "grow house." Certain observations during surveillance on March 1, 2007, caused officers to apply for a search warrant. While awaiting the warrant, police observed a Dodge Ram pickup truck towing a large recreational trailer emerge from the back yard, followed by a white Chevrolet Tahoe. Officers stopped the vehicles. Alfredo Hernandez was driving the Ram, Raul Prado was driving the Tahoe, and Blanca Cruz-Prado was his passenger.

After the officers stopped the vehicles, they observed two men walk around from the back of the house, enter the garage, close the door, and then flee into the woods. Officers chased and arrested the men; one was barefoot and the other was carrying large amounts of cash. They were later identified as Carlos Luis Perez and his father, Carlos Perez Martinez.

Meanwhile, a K-9 officer was summoned to the scene of the vehicular stop, and the officer's drug detection dog alerted to the vehicles. Officers detained Hernandez and the Prados while awaiting the arrival of the search warrant for the residence. Upon executing that warrant, officers discovered a marijuana growing operation in the basement, replete with more than 300 plants, a water recirculation system, a lighting system powered by large halogen bulbs and ballasts that moved on pulleys, a ventilation system powered by multiple air conditioning units, and an electrical system that tapped into the main power line. Perez, Martinez, Hernandez, and the Prados were arrested for manufacturing marijuana.

The Dodge Ram and the Tahoe were impounded, and the police obtained and executed search warrants for the vehicles. Although officers did not find any contraband in the Prados' Tahoe, they discovered 900 pounds of marijuana and over $99,000 in cash hidden in the trailer attached to the Dodge Ram. On May 30, 2007, all defendants were indicted for manufacturing marijuana and trafficking in marijuana. The Prados moved to suppress the evidence seized pursuant to the search warrants and the traffic stop, arguing that the warrants were invalid and that the stop was illegal because they had not committed a traffic offense and the police lacked any reasonable suspicion of criminal activity. After a nine-hour hearing, in which nine prosecution witnesses testified and were subject to cross-examination by four defense attorneys, each representing different defendants, the trial court issued a fourteen-page order denying the motion. The trial court granted a certificate of immediate review, however, and we granted the Prados' application for interlocutory appeal.

On appeal, the Prados urge us to apply the de novo standard of review, reciting the rule that "[w]hen an appellate court reviews a trial court's grant or denial of a motion to suppress, the trial court's findings as to disputed facts will be upheld unless clearly erroneous

and the trial court's application of the law to *undisputed* facts is subject to de novo review."[1] The de novo standard of review does not apply, however, because the facts herein were not "undisputed."[2] The trial court specifically stated in its order that it had assessed the demeanor and credibility of the witnesses, considered the evidence, and reconciled conflicts therein. Hence, we apply the following standard of review:

> At a hearing on a motion to suppress, the trial judge sits as the trier of fact. And Georgia law has long held that the trier of fact may believe or disbelieve all or any part of the testimony of any witness. Thus, on appellate review of a trial court's order on a motion to suppress evidence, we never second-guess the trial court's factual findings where they are based on testimonial evidence. We construe the evidence most favorably to the upholding of the trial court's findings and judgment and affirm unless the court has committed an error of law.[3]

So viewed, the evidence adduced at the suppression hearing held on September 9, 2009, shows that on October 11, 2006, Florida Highway Patrol Trooper Jason Lemery, who is assigned to the Contraband Interdiction Program, stopped a Ford Expedition on the Florida Turnpike for following too closely. As he approached the vehicle, which Perez was driving, Lemery noticed several boxes in the cargo area. Lemery testified that Perez seemed nervous, so Lemery asked him to step out of the vehicle and called another officer for backup. The second officer, Jimmy Douglas Davis, Jr., testified that he brought a drug detection dog, who alerted to the vehicle.

The Florida troopers searched the Expedition, finding marijuana residue on the floorboard. The boxes contained ten 1,000-watt electrical ballasts, which both troopers testified are commonly used in residential marijuana growing operations. When Lemery asked

---

[1] (Citation omitted; emphasis supplied.) *Petty v. State*, 283 Ga. 268, 269 (2) (658 SE2d 599) (2008).

[2] See *Robinson v. State*, 295 Ga. App. 136, 139 (670 SE2d 837) (2008) ("the facts are never 'undisputed' unless stipulated") (Mikell, J., concurring specially); *State v. Sanders*, 274 Ga. App. 393, 394 (617 SE2d 633) (2005). Compare *Silva v. State*, 278 Ga. 506, 508 (604 SE2d 171) (2004) (de novo review proper where trial court accepted officer's version of events but applied incorrect standard of law).

[3] (Punctuation and footnotes omitted.) *State v. Rowell*, 299 Ga. App. 238-239 (682 SE2d 343) (2009). See also *LeRoux v. State*, 300 Ga. App. 310, 311 (684 SE2d 424) (2009) (trial court's findings of fact based on conflicting evidence will not be disturbed on appeal if there is any evidence to support them); *Esposito v. State*, 293 Ga. App. 573 (667 SE2d 425) (2008) (same).

Perez for an explanation, he stated that he was traveling to Atlanta to see his father, who needed the equipment for outdoor lighting. Perez provided 2851 Creekwood Drive as an address. Lemery issued Perez a warning citation and released him. Lemery testified that because the traffic stop had occurred three years earlier, he had no independent recollection of the reason why he stopped Perez.

Suspecting that Perez was involved in a residential marijuana growing operation, known as a "grow house," Lemery transmitted the information he gleaned from the stop to Ja'net Sirles, an intelligence analyst with the Gwinnett County Police Department. Sirles testified that she compiled a report based on the information and entered it into the computer database. The report, which was entered into evidence, reflected that Perez had in his vehicle electrical ballasts sufficient to power 1,000-watt bulbs plus carbon filters, which were used in combination in large growing operations; that Perez's father, Martinez, purchased the home located at 2851 Creekwood Drive in May 2006; that the water bill was in Perez's name; and that the home's water usage was high, but not "off the charts."

The intelligence report was relayed to Detective Dean Boone with the City of Snellville Police Department, who was assigned at the time to the Gwinnett County Drug Task Force (the "Task Force"). Boone began conducting surveillance on the residence, driving by once or twice a month beginning in October 2006. He observed little activity, other than a U-Haul backed up in the driveway on February 22, 2007. Boone described the residence as a ranch style house over a basement, with a wooden privacy fence surrounding the back yard, and coverings over all of the windows, including the garage door windows, which were "frosted over." Boone testified that multiple grow houses with similar characteristics had been discovered in Gwinnett County and the metropolitan Atlanta area, so on March 1, 2007, he decided to drive by the Creekwood Drive residence again. Boone saw a red Dodge truck and a trailer parked in the back yard behind the privacy fence and a red Chevrolet Blazer parked in the driveway. Boone's suspicions were aroused, so he decided to contact the Task Force. Boone then returned around 5:00 p.m. with Sergeant J. E. Jolly of the Gwinnett County Police Department.

Jolly, who had been inside three grow houses, testified that the Task Force had begun to identify a pattern exhibited by them. The characteristics included a lot which sloped down away from the street, a basement, opaque coverings on the windows, a privacy fence surrounding the back yard, supplemental air conditioning units that were often concealed under a deck or porch, and additional air vents in the roof for ventilation. Jolly spoke with Sirles about the infor-

mation on the Creekwood Drive residence, contacted Boone, and they drove together to the residence. Jolly made contact with a next door neighbor, who allowed Jolly to observe the residence from his own back deck. Jolly could hear supplemental air conditioning units running; they were concealed under a deck. Neighbors told Jolly that they did not believe anyone lived there. No air conditioning units were running in neighboring homes. At that point, Jolly believed that probable cause existed to search the house, so he contacted Corporal Charles Moore, who was an undercover investigator with the Task Force, and asked Moore to apply for a search warrant. Jolly then returned to Boone's vehicle to discuss his findings, and Boone contacted uniform officers for assistance in the event anyone tried to leave the residence.

While sitting in the car, Boone and Jolly observed a man walk out from the side of the house and open the gate to the privacy fence. They also saw another man and a woman walk out the front door and enter the Tahoe, which was parked on the street in front of the house. That vehicle had not been present when Boone drove past the house earlier that day. The Dodge Ram, with the trailer in tow, then pulled out from the back yard through the gate in the fence and drove onto the street. Once on the street, the vehicles left in tandem, with the Tahoe following the Ram. As the vehicles approached the officers' surveillance location approximately 150 yards from the residence, Boone and Jolly decided to stop them. It was 5:17 p.m.

Three minutes after making the stop, Boone and Jolly observed two men at the house open the garage door, look in the officers' direction, and immediately retreat into the garage and shut the door. Jolly left Hernandez and the Prados with Boone and ran down the neighbor's lot along the fence behind the house; Jolly heard the individuals breaking brush as they ran through the woods. Jolly maintained visual contact with Boone and the house, and waited for uniform officers to arrive. Uniform officers apprehended Perez and Martinez.

K-9 officer David Matson, who worked for the Snellville Police Department, arrived at the scene of the vehicular stop. At 5:36 p.m., his dog performed a free-air sniff around the vehicles and trailer and alerted to the scent of a narcotic. Jolly contacted Moore, who was preparing the search warrant for the residence, to relay the developments at the scene, and they were included in the affidavit.

A magistrate issued a search warrant for the house at 7:28 p.m., and Moore delivered it to the officers on the scene at approximately 8:00 p.m. A search was conducted, revealing a marijuana growing operation. The Prados, along with Hernandez, Perez and Martinez, were arrested. The Dodge Ram was impounded, but the Tahoe was left at the scene, and a second K-9 officer who was present utilized

his dog to sniff the vehicle at approximately 10:30 p.m. The dog detected the odor of a narcotic coming from the Tahoe. The Tahoe was then impounded. Search warrants were issued for the vehicles, resulting in the seizure of 900 pounds of marijuana and over $99,000 in cash from the trailer towed by the Dodge Ram.

Based upon the oral testimony and the search warrants, including the affidavits submitted to the magistrate in support of the warrants, the trial court found that under the totality of the circumstances, the affidavit in support of the search warrant for the residence gave the magistrate a substantial basis for concluding that probable cause existed to issue the warrant;[4] that Boone and Jolly had reasonable suspicion to stop the vehicles; and that the search warrant for the vehicles was valid.

1. The Prados first contend that the trial court erred in determining that officers had reasonable suspicion to stop the Tahoe and the Ram while awaiting a search warrant for the Creekwood Drive residence.[5] We disagree.

A law enforcement officer may make a brief, investigatory stop of a vehicle when he has a reasonable, articulable suspicion that the person stopped has been, or is about to be, engaged in criminal activity.[6] "This specific, articulable suspicion must be based on the totality of the circumstances — e.g., objective observations, information from police reports, the modes or patterns of certain kinds of lawbreakers, and the inferences drawn and deductions made by a trained law enforcement officer";[7] "inferences and deductions that might well elude an untrained person."[8] "[A] founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing. . . . The existence of an articulable suspicion can be based on the collective knowledge of law enforcement officials."[9]

In the case at bar, the trial court found that Boone and Jolly had articulated a reasonable suspicion that the persons stopped were, or were about to be, engaged in criminal activity,[10] based on the following facts: (1) a search warrant for the Creekwood Drive

---

[4] *State v. Luck*, 252 Ga. 347 (312 SE2d 791) (1984).

[5] The state does not argue that the Prados lack standing to challenge the stop and the search of the Dodge Ram.

[6] *Garmon v. State*, 271 Ga. 673, 676 (2) (524 SE2d 211) (1999).

[7] (Citation and punctuation omitted.) *Ciak v. State*, 278 Ga. 27, 30 (3) (597 SE2d 392) (2004). Accord *Esposito*, supra at 576.

[8] *United States v. Cortez*, 449 U. S. 411, 418 (II) (A) (101 SC 690, 66 LE2d 621) (1981); accord *Evans v. State*, 262 Ga. App. 712, 716 (1) (b) (586 SE2d 400) (2003).

[9] (Citation and punctuation omitted.) *Buffington v. State*, 228 Ga. App. 810, 811 (492 SE2d 762) (1997).

[10] *Garmon*, supra.

residence was pending based on probable cause to believe that an active marijuana growing operation was being conducted inside; (2) the officers had information from multiple sources that the residence was in fact a marijuana grow house; (3) the sources included the intelligence report prepared as a result of the Florida traffic stop, which indicated that special lighting equipment used in marijuana growing operations was being delivered to the residence; and (4) the house exhibited the physical characteristics of other grow houses that had been recently discovered, of which the officers were aware based on their personal observations and their knowledge and experience. In addition, we note that the officers observed the Prados driving away from the residence in tandem with a truck and large recreational trailer, which had been obscured in the back yard behind a privacy fence.

"Appellate courts will not reverse a trial court's factual findings in the absence of evidence of a record *demanding* a finding contrary to the judge's determination."[11] Nothing in the record demands a finding contrary to the trial court's determination. Both Boone and Jolly testified that they had specialized training and experience in narcotics work, with Jolly having received 800 hours of narcotics-related training. Although the training was not specific to grow houses, Jolly testified that he had been inside three of them and was familiar with their characteristics. Giving due deference to the trial court's factual findings, we conclude that all of the facts, taken together, justified the stop based on a reasonable articulable suspicion that the occupants of the vehicles were involved in an active marijuana growing operation.[12]

No case cited by the Prados warrants reversal of the trial court's judgment. In *Pritchard v. State*,[13] police stopped the accused's car after receiving a call from an unidentified person "in reference to suspicious vehicles being in or around a residence that had recently been identified by police as an alleged drug house."[14] We concluded

---

[11] (Citation and punctuation omitted; emphasis in original.) *Satterfield v. State*, 289 Ga. App. 886, 888 (1) (658 SE2d 379) (2008). Accord *Anderson v. State*, 267 Ga. 116, 119 (2) (475 SE2d 629) (1996).

[12] See *Satterfield*, supra at 889 (2) (defendant spent five minutes in a residence of a known drug offender; house was under surveillance for drug activity; defendant drove away with a known drug offender and drove to the offender's residence; stop held valid); *State v. Flores*, 262 Ga. App. 389, 393 (585 SE2d 714) (2003) (whole court) (stop of vehicle, based on suspicion that defendant was transporting methamphetamine, was reasonable; methamphetamine had been found in the vehicle driven from the same apartment less than three months earlier); *Hayes v. State*, 202 Ga. App. 204-205 (414 SE2d 321) (1991) (stop of defendant held valid; he parked in front of a house where execution of a search warrant for contraband was imminent).

[13] 300 Ga. App. 14 (684 SE2d 88) (2009).

[14] (Punctuation and footnote omitted.) Id.

that the information received in the call, without more, did not constitute a reasonable basis for suspecting the accused of criminal activity and reversed the denial of his motion to suppress.[15]

In *State v. Mallard*,[16] the defendant was seen driving away from a house shortly before the police executed a search warrant for drugs at the residence, and the sole reason articulated by the police for the stop "was to see who was inside."[17] In affirming the grant of the defendant's motion to suppress, we emphasized that on appellate review, we were obliged to defer to the trial court's findings and to construe the evidence in favor of the defendants.[18] Similarly, in *State v. Hopper*,[19] we concluded that the trial court did not err in finding that the police lacked a sufficient basis for stopping the defendant after he was seen entering a suspected drug house and then leaving a few minutes later.[20]

Many facts distinguish this case from those cited above. In this case, unlike in *Mallard* and *Hopper*, the evidence must be construed in favor of the state.[21] In addition, officers in this case, unlike in *Pritchard*, observed activity giving rise to a particularized basis for their suspicion of wrongdoing. From a neighbor's deck, Jolly had observed activity at the back of the Creekwood Drive residence — running air conditioning units concealed under a deck, among other things — consistent with that of other marijuana growing operations that had been recently discovered in residences in the area, causing him to initiate a search warrant application. Jolly also knew that the houses had lots that sloped down to the back yard and that the growing operation took place in basements. Shortly after initiating the warrant application, Jolly observed a man open the gate to the privacy fence and a Dodge Ram towing a large recreational vehicle drive out of the back yard. The Prados left in tandem with this vehicle, waiting for it on the street and then following it. Under the totality of the circumstances, the facts were sufficient to establish an articulable suspicion so as to authorize a brief investigatory stop of the Prados.[22]

2. The Prados next contend that the search warrant for the residence was not supported by probable cause. We disagree.

---

[15] Id. at 16. See also *Thomas v. State*, 301 Ga. App. 198, 201-202 (1) (687 SE2d 203) (2009) (stop and frisk of defendant was unauthorized where officer had received no complaints of drug activity in area).

[16] 246 Ga. App. 357 (541 SE2d 46) (2000).

[17] Id. at 361.

[18] Id. at 360.

[19] 293 Ga. App. 220 (666 SE2d 735) (2008).

[20] Id. at 222.

[21] See *Rowell*, supra.

[22] See *Satterfield*, supra; *Flores*, supra; *Hayes*, supra.

A magistrate considers the totality of the circumstances in determining whether an affidavit provides probable cause for the issuance of a search warrant.[23]

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.[24]

In this regard, "substantial deference must be accorded a magistrate's decision to issue a search warrant based on a finding of probable cause."[25]

In this case, the trial court properly found that under the totality of the circumstances, the affidavit in support of the search warrant for the residence gave the magistrate a substantial basis for concluding that probable cause existed. The trial court relied on the following facts set forth in the affidavit: similar investigations and seizures had taken place in several grow houses in the greater Atlanta area within the prior 72 hours; the house under surveillance had characteristics similar to those houses; Jolly heard supplemental air conditioning units, which were concealed, running at the house, and neighbors told him that they did not believe anyone lived there; two men fled from the residence and were apprehended with large amounts of cash; two vehicles were stopped leaving the residence; and a drug detection dog alerted to the scent of narcotics coming from those vehicles.

The affidavit also set forth the information contained in the intelligence report obtained from Florida trooper Lemery regarding the stop of Perez. The Prados argue that the trial court erred in considering the information because (1) it was six months old and, therefore, stale; (2) the stop was illegal because the trooper could not recollect the reason for it; and (3) the affidavit erroneously stated that Lemery had transmitted the information to Boone, a law enforcement officer, rather than Sirles, the intelligence analyst at the police department.

---

[23] *State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984).

[24] (Citation and punctuation omitted.) Id. Accord *Roberson v. State*, 246 Ga. App. 534, 536-537 (1) (540 SE2d 688) (2000).

[25] (Citation omitted.) *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009).

(a) The passage of six months from the stop of Perez until the issuance of the warrant does not render the information gleaned from the stop stale. "[T]he mere passage of time will not render information stale, but rather is one of several factors to consider in the probable cause determination."[26]

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime, of the criminal, of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.[27]

A case in point is *Carruthers v. State*,[28] wherein our Supreme Court held that six-month-old information concerning a suspect's clothing and a handgun on the night of a murder was not stale, but instead supported the magistrate's conclusion that there was a reasonable probability that those items remained in existence at the place to be searched.[29] Similarly here, there was a substantial basis for believing that the electrical ballasts and light fixtures identified in the search warrant could still be found at the Creekwood Drive residence. The items were not perishable, and Perez stated that his father was going to use them at the residence. It follows that the information from the stop was not excludable as "stale."

(b) The trial court ruled that the Prados lacked standing to challenge the validity of the stop of Perez in Florida.[30] The Prados have failed to enumerate this ruling as error and have thus waived any purported error in connection with the legality of the stop.[31]

(c) The incorrect information in the affidavit regarding the person from whom Boone obtained the report concerning the stop of

---

[26] (Citation omitted.) *In the Interest of A. Z.*, 301 Ga. App. 524, 527-528 (1) (b) (687 SE2d 887) (2009).

[27] (Citation and punctuation omitted.) *Lemon v. State*, 279 Ga. 618, 622 (2) (619 SE2d 613) (2005). See also *Lewis v. State*, 255 Ga. 101, 104-105 (2) (335 SE2d 560) (1985) ("when the sworn testimony indicates the existence of an ongoing activity, the passage of time becomes less significant than would be the case with a single, isolated transaction"), citing *Luck*, supra.

[28] 272 Ga. 306 (528 SE2d 217) (2000), overruled on other grounds, *Vergara v. State*, 283 Ga. 175, 177 (1) (657 SE2d 863) (2008).

[29] *Carruthers*, supra at 312-313 (5).

[30] See, e.g., *Barnes v. State*, 269 Ga. 345, 348 (4) (496 SE2d 674) (1998) (appellant lacked standing to challenge search of accomplice's truck because appellant had no reasonable expectation of privacy therein).

[31] *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999) ("The appellate court is precluded from reviewing the propriety of a lower court's ruling if the ruling is not contained in the enumeration of errors") (citations omitted).

Perez does not invalidate the search warrant. "If a court determines that an affidavit submitted contains *material* misrepresentations or omissions, the false statements must be deleted, the omitted truthful material must be included, and the affidavit must be reexamined to determine whether probable cause exists to issue a warrant."[32] On the other hand, "[m]inor factual inaccuracies which are only peripherally relevant to the showing will not void the warrant where their presence in the affidavit is not such as to reflect on the credibility of the affiant."[33] That Boone relied on an intelligence report compiled by an analyst employed by the police department, rather than speaking directly to Lemery, is not material. The testimony of Lemery, Boone, and Sirles at the hearing shows that the information contained in the report was accurate. Therefore, the magistrate relied on correct information as contained in the report, and the warrant is not invalid for the reason asserted herein.

"Even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper."[34] Considering the totality of the circumstances, and giving due deference to the magistrate's finding of probable cause, we hold that the magistrate had a substantial basis for concluding that there was a fair probability that contraband would be found in the residence. The search warrant for the residence was supported by probable cause.

3. The Prados also contend that the search warrants for the vehicles were not supported by probable cause. Again, we disagree. At the outset, we note that the search would have been valid even without a warrant.

> While the general rule under the Fourth Amendment is that police officers must secure a warrant prior to conducting a search, there is an exception to that requirement for the searches of automobiles. The automobile exception provides that a police officer may search a car without a warrant if he has probable cause to believe the car contains contraband, even if there is no exigency preventing the officer from getting a search warrant.[35]

A trained and certified drug detection dog's alert on a vehicle provides probable cause to believe that contraband is present

---

[32] (Citation and punctuation omitted; emphasis supplied.) *Carter v. State*, 283 Ga. 76, 77 (2) (656 SE2d 524) (2008).

[33] (Citation and punctuation omitted.) *Moore v. State of Ga.*, 209 Ga. App. 89, 90 (1) (432 SE2d 597) (1993).

[34] (Citation omitted.) *Sullivan v. State*, 284 Ga. 358, 361 (2) (667 SE2d 32) (2008).

[35] (Citations and punctuation omitted.) *Martinez v. State*, 303 Ga. App. 166, 170 (2) (692 SE2d 766) (2010).

therein.[36] Here, K-9 officer Matson testified that he deployed his trained and certified drug detection dog on the vehicles at the scene, and the dog alerted on them. This alone gave the officers probable cause to conduct a search. However, they decided to impound the vehicles incident to the arrest of the occupants and secure a warrant instead. The affidavit in support of the warrant recites the positive alert by Matson's canine, as well as the marijuana growing operation in the residence from which the vehicles drove away. Based on the totality of the circumstances, the affidavit provided the magistrate with a substantial basis for concluding that probable cause existed to believe that contraband would be found in the vehicles.[37]

4. Finally, the Prados contend that the search warrant for the vehicles was invalid because a second original of one of the affidavits was not signed by the attesting officer. We disagree.

"It is axiomatic that the signature of the affiant is necessary to the validity of an affidavit."[38] In the case at bar, however, there were multiple original affidavits, only one of which was unsigned. In its factual findings, the trial court determined that the magistrate issued a set of three originals: one to be left in the magistrate court's file, one to be served at the time of the search, and one to be returned to the magistrate court's file after the search was conducted. The court further found that *only* the original that was left in the magistrate court's file lacked a signature by the affiant. These findings are supported by the evidence. Sutton, the affiant, explained that he took three identical search warrants to the magistrate on March 2, 2007; that he signed two of the affidavits but inadvertently failed to sign the third one; and that he served Raul Prado and Hernandez with the warrants by leaving copies for them at the jail. The evidence, construed most favorably to uphold the trial court's judgment, supports its finding that the warrant actually served contained the affiant's signature. We therefore conclude that the absence of a signature on the affidavit left in the magistrate court's file did not invalidate the warrant.

For all of the above-cited reasons, the trial court did not err in denying the Prados' motion to suppress.

*Judgments affirmed. Smith, P. J., and Adams, J., concur and concur specially.*

---

[36] *Dawson v. State*, 238 Ga. App. 263, 266-267 (1) (518 SE2d 477) (1999); *Milan v. State*, 228 Ga. App. 310, 311 (491 SE2d 401) (1997); *Roundtree v. State*, 213 Ga. App. 793, 794-795 (446 SE2d 204) (1994).

[37] See, e.g., *Cole v. State*, 279 Ga. App. 219, 223 (3) (630 SE2d 817) (2006) (affidavit and oral testimony provided magistrate with a substantial basis for finding probable cause that crimes occurred in defendant's vehicle).

[38] (Punctuation omitted.) *Henry v. State*, 277 Ga. App. 302, 304 (1) (626 SE2d 511) (2006), citing *State v. Barnett*, 136 Ga. App. 122, 123 (220 SE2d 730) (1975).

ADAMS, Judge, concurring specially.

I concur fully in the majority opinion and the reasoning, except that I cannot agree with the statement in footnote 2 that "the facts are never 'undisputed' unless stipulated."

I am authorized to state that Presiding Judge Smith joins in this special concurrence.

DECIDED SEPTEMBER 29, 2010 —

*K. Julie Hojnacki, Cathy M. Alterman, Bruce S. Harvey*, for appellant.

*Daniel J. Porter, District Attorney, Rodney K. Miles, Assistant District Attorney*, for appellee.